# Supreme Court of Texas

No. 20-0727

Terisa Taylor,

*Petitioner,*

v.

Carl Tolbert, Nizzera Kimball and Vivian Robbins,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued February 1, 2022**

JUSTICE DEVINE delivered the opinion of the Court.

Under Texas law, attorneys are generally immune from civil liability to nonclients for actions taken within the scope of legal representation if those actions involve "the kind of conduct" attorneys engage in when discharging their professional duties to a client.[1] In recent years, we have had several occasions to consider the scope of this common-law immunity defense. When presented with the question, we

---

[1] *See Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 51 (Tex. 2021); *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 482 (Tex. 2015).

have held that the immunity inquiry focuses on the function and role the lawyer was performing, not the alleged wrongfulness, or even asserted criminality, of the lawyer's conduct.[2] The nuance presented here is whether an exception exists for private-party civil suits asserting that a lawyer has engaged in conduct criminalized by statute.

We hold that, when conduct is prohibited by statute, the attorney-immunity defense is neither categorically inapplicable nor automatically available, even if the defense might otherwise cover the conduct at issue. In such cases, whether an attorney may claim the privilege depends on the particular statute in question. That being so, the attorney in this case is only entitled to partial immunity on civil claims alleging she violated state and federal wiretap statutes by "using" and "disclosing" electronic communications illegally "intercepted" by her client and others. Immunity attaches to the state claims because the Texas wiretap statute does not expressly, or by necessary implication, abrogate the immunity defense, and the attorney met her burden to establish its applicability to the conduct at issue. But immunity does not attach to the federal claims because the federal wiretap statute is worded differently, and informative federal authority (sparse as it is) persuades us that federal courts would not apply Texas's common-law attorney-immunity defense to a claim under that statute. We thus affirm the court of appeals' judgment that the attorney-immunity defense is inapplicable to the federal wiretap claims but reverse and render judgment for the attorney on the state wiretap claims.

---

[2] *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 657-58 (Tex. 2020); *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018); *Cantey Hanger*, 467 S.W.3d at 481 & 485.

## I. Background

The underlying dispute originates from a child-custody modification proceeding between Mark Broome and Vivian Robbins regarding their child, N.B. Attorney Terisa Taylor represented Broome in the highly acrimonious family-law case.

In the midst of the modification proceeding,[3] N.B. visited her aunt, Fiona McInally, in the summer of 2013. At some point, an iPad belonging to McInally began receiving text messages and emails between Robbins and at least thirty other individuals, all of whom were unaware this was happening and none of whom consented. How this happened remains something of a mystery, but there appears to be no dispute that N.B. had signed into her aunt's iPad using Robbins's email address and password to download an app. After discovering the text messages, McInally or her husband (Broome's brother) mailed the iPad to Broome, who obtained Robbins's text messages and emails from the iPad and shared them with Taylor for use in the modification proceeding.

Robbins and several of her interlocutors, including Carl Tolbert and Nizzera Kimball,[4] sued Taylor and others for violating the federal and Texas wiretap statutes.[5] Wiretapping is a criminal offense under

---

[3] Although the allegations in this civil suit are disputed, the applicable standard of review requires us to accept the allegations as true. *City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 301 (Tex. 2017). We relay them accordingly.

[4] The other plaintiffs are not parties to this appeal.

[5] The other defendants, including Broome, have since settled, leaving Taylor the sole remaining defendant.

3

federal and state law,[6] but both statutory schemes permit private parties to pursue civil redress for violations of the penal statutes.[7] The federal statute provides a civil cause of action for "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter[.]"[8] Texas likewise grants a private right of action for "[a] person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of" certain statutes, including Chapter 16 of the Penal Code and Chapter 18A of the Code of Criminal Procedure.[9] Robbins, Tolbert, and Kimball (collectively, Robbins) alleged that Taylor had improperly "used" and "disclosed" illegally "intercepted" electronic communications in the following particulars:

- received the text messages and emails her client, Broome, shared with her;

- produced a CD containing data from the iPad to Robbins's attorney;

- told opposing counsel that "she and her client were in possession of everything Ms. Robbins had communicated to others, including a nude photograph that Ms. Robbins had sent via text message to her boyfriend";

- told opposing counsel that she intended to use the nude photograph as a poster-size demonstrative in the jury trial;

---

[6] 18 U.S.C. § 2511(1); TEX. PENAL CODE § 16.02.

[7] 18 U.S.C. § 2520(a); TEX. CODE CRIM. PROC. art. 18A.502.

[8] 18 U.S.C. § 2520(a).

[9] TEX. CODE CRIM. PROC. art. 18A.502(1). Chapter 18A and Chapter 16 of the Penal Code prohibit wiretapping.

4

- told opposing counsel to advise Robbins to "sign an agreed order resolving the custody case and agreeing to supervised visitation only or this evidence would be used against her";

- "filed an unusual pleading entitled 'Notice of Intent to Use Demonstrative Evidence'[,] which said that Mark Broome intended to use . . . [a] 'Power Point presentation and large photo board'" at trial;

- for at least six months, "used information gleaned from the illegally intercepted communications in several family court hearings and to conduct discovery in the child custody modification case . . . prior to Ms. Robbins becoming aware of the interception," which she learned about when Taylor produced 617 pages of Robbins's text messages to her attorney and when Broome filed a pleading referencing the content of Robbins's email messages;

- "[repeatedly] used and disclosed the contents of those intercepted electronic communications to the court and in [] pleadings in the modification case";

- "provided Fiona McInaly's [sic] iPad to Pathway Forensics, LLC for examination";[10] and

- used the illegally intercepted communications on McInally's iPad to obtain a court order authorizing Pathway Forensics to make a copy of Robbins's electronic devices.[11]

---

[10] Pathway Forensics is a computer forensics company that Broome had retained as an expert witness. Robbins sued Pathway, and the court of appeals ruled favorably to Robbins on those claims, but Pathway did not file a petition for review in this Court. Taylor and Robbins report that the claims against Pathway have been settled.

[11] The trial court ordered Pathway to "properly and noninvasively create backup images of all drives and media in the custody of [Robbins], via her I-phone/cell phones [sic], I-Pad [sic], Laptop and/or home computer, that

5

Notably, the petition does not allege any facts suggesting that Taylor played a role in the alleged "interception" of Robbins's electronic communications or that she advised Broome or others to take these actions. Rather, the factual allegations against Taylor are limited to her "use" and "disclosure" of those communications in the modification proceeding.

Taylor moved for traditional summary judgment solely on the pleadings, arguing she is immune from liability as a matter of law because the plaintiffs' claims all stem from her role as an attorney in the modification proceeding.[12] The trial court agreed and rendered a take-nothing summary judgment for Taylor.

In a split decision, the court of appeals reversed and remanded.[13] After noting that our attorney-immunity decisions in *Cantey Hanger, LLP v. Byrd*[14] and *Youngkin v. Hines*[15] neither "involved alleged criminal conduct by an attorney" nor extended attorney immunity to criminal conduct, the majority summarily determined that "[a] criminal violation of either [the federal or state wiretap] statute would be 'foreign to the duties of an attorney' and thus precludes application of attorney[]immunity."[16]

---

may contain electronic data relevant to the issues in this matter, except any attorney client privilege matters."

[12] *See* TEX. R. CIV. P. 166a(c).

[13] 629 S.W.3d 318, 327, 334 (Tex. App.—Houston [14th Dist.] 2020).

[14] 467 S.W.3d 477 (Tex. 2015).

[15] 546 S.W.3d 675 (Tex. 2018).

[16] 629 S.W.3d at 327.

6

Examining our attorney-immunity precedent in more detail, the dissent found the majority's holding to be directly adverse to *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*,[17] in which we rejected the invitation to create a "criminal conduct" exception to the attorney-immunity defense and applied the defense to litigation conduct alleged to be criminal in nature.[18] The dissent then cited two independent reasons to affirm summary judgment for Taylor. First, the dissent declared Robbins's petition fatally deficient in failing to plead facts showing Taylor had engaged in conduct violating the wiretap statutes.[19] As to that matter, the dissent noted the absence of factual allegations showing (1) "contemporaneous acquisition of the communication when it was sent," as required to establish an "interception," and (2) that Taylor knew, should have known, or was reckless in disregarding that the communications had been "intercepted," as required to make "use" or "disclosure" of "intercepted" communications impermissible.[20] Second, even if Robbins had pleaded sufficient facts to state a claim under the wiretap statutes, Taylor's alleged conduct fell directly within the scope of her representation of Broome in the modification proceeding and was not "foreign to the duties

---

[17] 595 S.W.3d 651 (Tex. 2020).

[18] 629 S.W.3d at 339-40 (Frost, C.J., dissenting).

[19] *Id.* at 345. Taylor did not argue or brief that issue here or in the courts below, so we do not address it.

[20] *Id.* at 341-45 & nn.64-78; *see, e.g.*, *Babb v. Eagleton*, 616 F. Supp. 2d 1195, 1206 (N.D. Okla. 2007) ("[I]f no unlawful interception initially occurred, there can be no liability for subsequent use or disclosure of the interceptions by Attorney and Law Firm.").

7

of an attorney."[21] Applying *Bethel*, which the majority failed to discuss or cite, the dissent concluded that, as a matter of law, attorney immunity protects Taylor from civil liability because the conduct about which Robbins complains involved Taylor's rendition of legal services to a client in the course of litigation.[22]

We granted Taylor's petition for review to further refine the boundaries of the attorney-immunity defense. The principal matter in dispute is whether the immunity defense applies to alleged conduct that, if proven, is criminalized by statute.

## II. Discussion

As the summary-judgment movant on an affirmative defense, Taylor bears the burden of conclusively establishing that attorney immunity bars the plaintiffs' recovery on the claims asserted.[23] "The only facts required to support an attorney-immunity defense are the type of conduct at issue and the existence of an attorney–client relationship at the time" the attorney engaged in the conduct.[24] We must then decide "the legal question of whether said conduct was within the scope of representation."[25] Because Taylor moved for summary judgment on the pleadings, we must take the allegations in Robbins's

---

[21] 629 S.W.3d at 345 (Frost, C.J., dissenting).

[22] *Id.* at 345-46.

[23] *Cantey Hanger*, 467 S.W.3d at 481; *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215-16 (Tex. 2003).

[24] *Youngkin*, 546 S.W.3d at 683.

[25] *Id.*

petition as true, and we will uphold summary judgment for Taylor only if she is entitled to judgment as a matter of law.[26]

### A. Scope of Attorney-Immunity Defense

The common-law attorney-immunity defense applies to lawyerly work in "all adversarial contexts in which an attorney has a duty to zealously and loyally represent a client" but only when the claim against the attorney is based on "the kind of conduct" attorneys undertake while discharging their professional duties to a client.[27] Stated inversely, if an attorney engages in conduct that is not "lawyerly work" or is "entirely foreign to the duties of a lawyer" or falls outside the scope of client representation, the attorney-immunity defense is inapplicable.[28]

In determining whether conduct is "the kind" immunity protects, the inquiry focuses on the *type* of conduct at issue rather than the alleged wrongfulness of that conduct.[29] But when the defense applies, counsel is shielded only from liability in a civil suit, not from "other mechanisms" that exist "to discourage and remedy" bad-faith or wrongful conduct, including sanctions, professional discipline, or criminal penalties, as appropriate.[30]

---

[26] *Perry v. S.N.*, 973 S.W.2d 301, 303 (Tex. 1998); *see City of Magnolia 4A Econ. Dev. Corp.*, 533 S.W.3d at 301; TEX. R. CIV. P. 166a(c).

[27] *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 67 (Tex. 2021); *see, e.g.*, *Landry's*, 631 S.W.3d at 47; *Cantey Hanger*, 467 S.W.3d at 481.

[28] *Landry's*, 631 S.W.3d at 47, 51-53; *Youngkin*, 546 S.W.3d at 681.

[29] *Landry's*, 631 S.W.3d at 47.

[30] *E.g.*, *Bethel*, 595 S.W.3d at 657-58; *Youngkin*, 546 S.W.3d at 679, 682-83; *Cantey Hanger*, 467 S.W.3d at 482, 484-86; *Kruegel v. Murphy*, 126 S.W. 343, 344-45 (Tex. App.—Dallas 1910, writ ref'd).

Conduct is not the kind of conduct attorney immunity protects "simply because attorneys often engage in that activity" or because an attorney performed the activity on a client's behalf.[31] Rather, the conduct must involve "the uniquely lawyerly *capacity*" and the attorney's *skills as an attorney*.[32] For example, a lawyer who makes publicity statements to the press and on social media on a client's behalf does "not partake of 'the office, professional training, skill, and authority of an attorney'" because "[a]nyone—including press agents, spokespersons, or someone with no particular training or authority at all—can publicize a client's allegations to the media."[33] Immunity attaches only if the attorney is discharging "lawyerly" duties to his or her client.[34]

A corollary to this principle is that attorneys will not be entitled to civil immunity for conduct that is "entirely foreign to the duties of an attorney." "Foreign to the duties" does not mean something a good attorney should not do; it means that the attorney is acting outside his or her capacity and function as an attorney.[35] For that reason, whether

---

[31] *Landry's*, 631 S.W.3d at 52.

[32] *See id.* at 51-53 (emphasis added) (quoting *Cantey Hanger*, 467 S.W.3d at 482).

[33] *Id.* at 51-52 (quoting *Cantey Hanger*, 467 S.W.3d at 482).

[34] *Cantey Hanger*, 467 S.W.3d at 481.

[35] *E.g.*, *Youngkin*, 546 S.W.3d at 681; *Cantey Hanger*, 467 S.W.3d at 482, 487; *see Poole v. Hous. & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882) (holding that an attorney who had assumed ownership of a third party's goods "with the intention of consummating [a] fraud" on a third party "will not be heard to deny his liability to [the third party] for the loss sustained by reason of his wrongful acts, under the privileges of an attorney at law, for such acts are entirely

counsel may claim the privilege turns on the task that was being performed, not whether the challenged conduct was meritorious.

This is so because the interests of clients demand that lawyers "competently, diligently, and zealously represent their clients' interests while avoiding any conflicting obligations or duties to themselves or others."[36] To prevent chilling an attorney's faithful discharge of this duty, lawyers must be able to pursue legal rights they deem necessary and proper for their clients without the menace of civil liability looming over them and influencing their actions.[37] Attorney immunity furthers "loyal, faithful, and aggressive representation" by "essentially . . . removing the fear of personal liability,"[38] thus "alleviating in the mind of [an] attorney any fear that he or she may be sued by or held liable to a non-client for providing . . . zealous representation."[39] In this way, the defense protects not only attorneys but also their clients, who can be assured that counsel is representing the client's best interests, not the lawyer's.

---

foreign to the duties of an attorney"); *Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer & Oshman, P.C.*, No. 01–06–00696–CV, 2008 WL 746548, at *9 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) ("The signing and filing of an application for a temporary restraining order to aid in the recovery of monies owed to a client under an arbitration award is not conduct 'foreign to the duties of an attorney' and is the kind of conduct protected from liability.").

[36] *Haynes & Boone*, 631 S.W.3d at 79.

[37] *See Cantey Hanger*, 467 S.W.3d at 483.

[38] *Youngkin*, 546 S.W.3d at 682.

[39] *Haynes & Boone*, 631 S.W.3d at 79.

Because the wrongfulness of the attorney's conduct is not the focus of the immunity inquiry,[40] we held in *Cantey Hanger* that conduct alleged to be fraudulent does not necessarily fall outside the scope of the attorney-immunity defense.[41] We explained that a "general fraud exception" would "significantly undercut" the purposes of the defense[42] by allowing lawyers to be sued for discharging their lawyerly duties if the plaintiff characterizes the attorney's conduct as fraudulent.[43] But "[m]erely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney.'"[44]

In *Bethel*, we extended this principle to allegations of criminal conduct. There, the plaintiff had urged us "to recognize an exception" to attorney immunity "whe[n] a third party alleges that an attorney engaged in criminal conduct during the course of litigation."[45] We again rejected the invitation to adopt an exception or state a categorical rule because doing so would allow plaintiffs to avoid the attorney-immunity defense through artful pleading—"by merely alleging that an attorney's

---

[40] *Id.* at 78; *Bethel*, 595 S.W.3d at 658; *Youngkin*, 546 S.W.3d at 681; *Cantey Hanger*, 467 S.W.3d at 481.

[41] 467 S.W.3d at 484-86.

[42] *Id.* at 483.

[43] *Landry's*, 631 S.W.3d at 47 (quoting *Cantey Hanger*, 467 S.W.3d at 482).

[44] *Bethel*, 595 S.W.3d at 657 (alteration in original) (quoting *Cantey Hanger*, 467 S.W.3d at 483-84).

[45] *Id.*

12

conduct was 'criminal.'"[46] Like the fraud exception that *Cantey Hanger* declined to embrace, *Bethel* eschews a categorical exception for criminal conduct because such an exception would defeat the purposes of the attorney-immunity defense.[47] Instead, we held that conduct alleged to be criminal in nature "is not categorically excepted from the protections of attorney civil immunity when the conduct alleged is connected with representing a client in litigation."[48] As we explained there, a lawyer who is doing his or her job is not more susceptible to civil liability just because a nonclient asserts that the lawyer's actions are fraudulent, wrongful, or even criminal.[49]

Even so, we acknowledged then, as we do now, that "there is a wide range of criminal conduct that is not within the 'scope of client representation' and [is] therefore 'foreign to the duties of an attorney.'"[50] But when that is the case, the circumstances do not give rise to an "exception" to the immunity defense; rather, such conduct simply fails to satisfy the requirements for invoking the defense in the first instance.[51] As *Bethel* makes clear, our approach to applying the

---

[46] *Id.*

[47] *Id.*

[48] *Id.* (citations omitted).

[49] *Id.* (quoting *Youngkin*, 546 S.W.3d at 681).

[50] *Id.* at 658.

[51] *Id.*

13

attorney-immunity defense remains functional, not qualitative, and leaves an attorney's improper conduct addressable by public remedies.[52]

Robbins nonetheless campaigns for a "narrow exception" to immunity for civil liability that arises from a statute criminalizing conduct. As Robbins notes, none of our precedent has involved similar claims, and she contends that a common-law defense, like attorney immunity, cannot be engrafted onto a statutory scheme unless the statute expressly adopts the defense. Separately, and in addition, Robbins asserts that Taylor's alleged conduct was "foreign to the duties of an attorney" because it is criminal in nature. We address these arguments below.

## B. Application to Taylor's Conduct

We first consider whether Taylor's conduct is encompassed by the attorney-immunity defense at all. This is a legal question we determine from the facts Robbins has alleged, which we take as true under the applicable standard of review.[53] Focusing only on "the kind" of conduct, as we must, the standard for attorney immunity is easily satisfied on the pleaded allegations because Taylor's conduct was (1) within the

---

[52] While the potential for sanctions, professional discipline, and criminal responsibility might be equally, if not more, concerning to an attorney than the potential for civil liability, the public oversight required to pursue such penalties helps ensure that attorneys discharging their duties are not subject to the threat of litigation by anyone who might take issue with the attorney's performance on behalf of his or her client in the course and scope of legal representation. If an attorney's conduct in his or her capacity as an attorney is wrongful, recourse is public, not private.

[53] *See supra* n.3.

scope of her representation of Broome in the modification proceeding and (2) not foreign to the duties of a lawyer.

Acquiring materials from a client pertaining to a matter in dispute and reviewing, copying, retaining custody of, analyzing, and producing those materials are paradigmatically "the provision of 'legal' services involving the unique office, professional skill, training, and authority of an attorney."[54] So too is all the other conduct about which Robbins complains. Using information acquired from a client to conduct discovery, in pleadings, in communications with the court, and to obtain a court order; attempting to use that information as demonstrative evidence at trial; and providing materials to an expert witness all fall squarely within the scope of Taylor's representation of Broome in the modification proceeding.[55] Likewise, making a demand on a client's behalf—such as Taylor's insistence that Robbins sign a proposed order resolving the dispute—is also within the realm of legal representation.[56] In engaging in these activities, Taylor acted on behalf of her client in a

[54] *Haynes & Boone*, 631 S.W.3d at 78.

[55] *Cf. Bethel*, 595 S.W.3d at 658 ("Thus, at bottom, Bethel takes issue with the manner in which Quilling examined and tested evidence during discovery in civil litigation while representing Bethel's opposing party. These are paradigmatic functions of an attorney representing a client in litigation.").

[56] *See Youngkin*, 546 S.W.3d at 684 ("The conduct Hines complains of— negotiating and entering a settlement agreement . . . —falls within the scope of Youngkin's representation . . . and is not foreign to the duties of a lawyer."); *Highland Cap. Mgmt., LP v. Looper Reed & McGraw, P.C.*, No. 05–15–00055– CV, 2016 WL 164528, at *6 (Tex. App.—Dallas Jan. 14, 2016, pet. denied) (mem. op.) (holding that actions including "making demands on the client's behalf, advising a client to reject counter-demands, speaking about an opposing party in a negative light, advising a client on a course of action, and even threatening particular consequences" are within the scope of an attorney's legal representation of a client).

lawyerly capacity because conducting discovery, filing pleadings, obtaining court orders, and seeking the admission of evidence are the kinds of actions that lawyers undertake in representing a client. Taylor engaged in this conduct in connection with her duties as a lawyer in the adversarial context of the modification proceeding where her client's objective was to secure enhanced custodial rights.[57]

Considering all the allegations in Robbins's petition, Taylor was, in all respects, engaging in "the office, professional training, skill, and authority of an attorney" in the ways that she allegedly used and disclosed the materials her client provided. Because Taylor's conduct falls squarely within the confines of attorney immunity, the alleged criminality or wrongfulness of the conduct does not perforce preclude its availability as an affirmative defense.[58]

This conclusion does not, however, terminate the analysis. We must also consider Robbins's argument that the common-law attorney-immunity defense is unavailable—either categorically or specifically—as a defense to her statutory claims. In *Bethel*, no statutory causes of action were pressed against the attorney—it is a spoliation case. But the source of the plaintiff's claim, whether under the common law or a statute, does not, alone, nullify the immunity defense. That being the case, if attorney immunity is unavailable here, it is only because the specific statutes at issue—the state and federal wiretap statutes—preclude it. On that score, we do not agree with Robbins that the defense is only available if a statute expressly adopts

---

[57] *Haynes & Boone*, 631 S.W.3d at 78.

[58] *See Bethel*, 595 S.W.3d at 657.

16

it, and we hold that the Texas wiretap statute does not abrogate the defense. However, for reasons we explain below, we conclude that Texas's common-law attorney-immunity defense is unavailable under the federal statute.

## C. Texas Wiretap Statute

Common-law defenses may be abrogated by statute,[59] but under Texas law, statutes purporting to abrogate common-law principles must do so either expressly or by necessary implication.[60] Texas's wiretap statute does not expressly repudiate the common law or the attorney-immunity defense. Robbins nonetheless argues that because the Legislature enacted specific defenses to criminal prosecution and civil liability for wiretapping, the statute necessarily fences out all common-law defenses not explicitly articulated in the statute.[61] And because the wiretap statute does not expressly adopt the common-law attorney-immunity defense, Robbins contends Taylor may not rely on it.

Under Robbins's line of reasoning, the Legislature would be required to expressly enact or "opt into" each and every defense applicable to a given cause of action, including defenses that exist under common law. But that is not the law in this state. As a general proposition, we follow an "opt-out" approach that incorporates

---

[59] *See Dugger v. Arredondo*, 408 S.W.3d 825, 836 (Tex. 2013).

[60] *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 428 (Tex. 2017).

[61] *E.g.*, TEX. CODE CRIM. PROC. art. 18A.504; TEX. PENAL CODE § 16.02(c).

17

common-law principles absent the Legislature's clear repudiation.[62] Accordingly, the Legislature need not expressly adopt the attorney-immunity defense for it to apply to claims under the wiretap statute.

As we have often said, courts presume that the Legislature acted with complete knowledge of existing law and with reference to it.[63] When the Legislature makes law, it does so against a backdrop in which common-law defenses abound, and those defenses are generally available unless the Legislature clearly indicates otherwise.[64] We will

---

[62] *Compare Forest Oil*, 518 S.W.3d at 428 ("Abrogation of a common-law right, as we have said, 'is disfavored and requires a clear repugnance' between the common-law cause of action and the statutory remedy. A statute's 'express terms or necessary implications' must indicate clearly the Legislature's intent to abrogate common-law rights." (quoting *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000))), *with Smith v. Baldwin*, 611 S.W.2d 611, 616-17 (Tex. 1980) ("In light of the facts that the DTPA was not designed to be a codification of the common law, the absence of a mental state element . . . and [the element's] inclusion in other subdivisions, the legislative history of the 1979 amendments, and in keeping with the mandate of liberal construction, we hold [that a particular DTPA provision] does not require proof or a finding of intentional misrepresentation before the sanctions of the DTPA are imposed.").

[63] *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 106-07 (Tex. 2021) ("Because we presume that the Legislature uses statutory language 'with complete knowledge of the existing law and with reference to it,' we have concluded that concepts included in the Legislature's 'seller' definition acquired particular meaning from our common-law products liability cases." (quoting *In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012)) (citations omitted)).

[64] *Cf., e.g.*, *Dugger*, 408 S.W.3d at 832 ("When the Legislature intends an exception to Chapter 33's broad scheme, it creates specific exceptions for matters that are outside the scope of proportionate responsibility. . . . We find no such indication that the Legislature intended a plaintiff's unlawful conduct to be treated differently from the other common law defenses under the former contributory negligence scheme[.]").

not presume the contrary, so we cannot conclude that the attorney-immunity defense is inapplicable to a state wiretapping claim unless the Legislature explicitly abrogated the defense or the defense inherently conflicts with the statute.[65] Statutes "creat[ing] a liability unknown to the common law," like the Texas wiretap statute, are "strictly construed in the sense that [the statute] will not be extended beyond its plain meaning or applied to cases not clearly within its purview."[66] That means courts "must look carefully to be sure" the Legislature intended to "modify common law rules."[67]

Robbins does not contend that the Texas wiretap statute expressly repudiates common-law defenses, but she suggests that it does so by necessary implication. Though she points out that the Code of Criminal Procedure codifies a good-faith defense to the private right of action for wiretapping[68] and the Penal Code provides specific affirmative

---

[65] *See Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex. 2007) ("Of course, statutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended."); *cf. Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 856-57 (Tex. 1999) ("Nothing in the DTPA evidences a legislative intent to withdraw mitigation of damages as an affirmative defense . . . . Nor does the concept of mitigation inherently conflict with the DTPA.").

[66] *Smith v. Sewell*, 858 S.W.2d 350, 354 (Tex. 1993).

[67] *Energy Serv. Co.*, 236 S.W.3d at 194; *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex. 1969).

[68] TEX. CODE CRIM. PROC. art. 18A.504 (stating that "good faith reliance on a court order or legislative authorization constitutes a complete defense to an action brought under Article 18A.502").

19

defenses to criminal prosecution,[69] the Legislature did not make those defenses exclusive, and the statute cannot be fairly read as *clearly repudiating* civil-liability defenses otherwise available under the common law.

Robbins also cites the statute's language creating "a civil cause of action against *any person* who intercepts, discloses, or uses . . . the communication[.]"[70] Although "any person" would inarguably include attorneys, we are not convinced that the breadth of the statutory language—which is not at all uncommon—clearly shows legislative intent to abrogate common-law defenses generally or attorney immunity specifically.[71] The attorney-immunity doctrine does not apply to all conduct by attorneys, so attorneys are not precluded from being the subject of a wiretap claim even though some of their conduct may give rise to an immunity defense. In this regard, Robbins suggests a false dichotomy. In reality, attorneys can be persons to whom the statute applies and also immunized from civil liability for the kind of conduct the immunity defense protects.

Nor does the statute's evidentiary bar render Taylor's conduct foreign to the duties of an attorney or abrogate the attorney-immunity defense. The Texas wiretap statute precludes "[t]he contents of an intercepted communication and evidence derived from the

---

[69] TEX. PENAL CODE § 16.02(c) ("It is an affirmative defense to prosecution under Subsection (b) that . . . .").

[70] TEX. CODE CRIM. PROC. art. 18A.502 (emphasis added).

[71] *See Energy Serv. Co.*, 236 S.W.3d at 194 (before construing a statute to modify common-law rules, "we must look carefully to be sure that was what the Legislature intended").

20

communication" from being "received in evidence in any trial, hearing, or other proceeding in or before any court,"[72] but this limitation on *admissibility* of evidence is not repugnant to the attorney-immunity defense because the sum total of an attorney's legal duties does not begin and end with admissibility of evidence.  First, inadmissibility of evidence does not foreclose all uses or disclosures of that evidence.[73]  For example, relevant information that is reasonably calculated to lead to admissible evidence at trial is discoverable even though that information may later be ruled inadmissible.[74]  Similarly, an attorney like Taylor who receives such evidence from a client may be under a duty to produce (i.e., use and disclose) such evidence if responsive to an appropriate request from an opposing party.  More significantly, the evidentiary bar does not speak to an attorney's nonlitigation adversarial uses and disclosures at all.

Second, like other rules of evidence, this statute governs what a trial court may receive into evidence—*not* what an attorney may seek to have admitted.[75]  In other words, it decrees what a court may do, not what an attorney may do.  Declaring intercepted communications and

---

[72] TEX. CODE CRIM. PROC. art. 18A.357(a)(1).  The federal wiretap statute contains a similar prohibition.  18 U.S.C. § 2515.

[73] We emphasize, however, that the defense does not permit attorneys who, for example, make bad-faith arguments for admissibility or intentional misrepresentations to a court to escape sanction or disciplinary action if appropriate.

[74] *See* TEX. R. CIV. P. 192.3(a).

[75] *See* TEX. CODE CRIM. PROC. art. 18A.357(a)(1) ("The contents of an intercepted communication and evidence derived from the communication *may be received* in evidence in any trial, hearing, or other proceeding in or before any court . . . *unless* . . . the communication was intercepted in violation of this chapter, Section 16.02, Penal Code, or federal law[.]" (emphases added)).

evidence derived therefrom inadmissible is not clearly incompatible with the attorney-immunity defense because this evidentiary limitation does not comprehensively address the duties or conduct of a lawyer in the representation of a client and instead speaks only to a narrow type of attorney conduct.

Indeed, the statute includes no provision that is inherently adverse to immunizing attorneys from civil liability for their legal work on behalf of their clients. In *Troice v. Greenberg Traurig, L.L.P.*, the Fifth Circuit came to a similar conclusion in determining that the Texas Securities Act (TSA) did not abrogate the attorney-immunity defense.[76] The court explained that (1) the TSA "contains no explicit abrogation of immunity";[77] (2) attorney immunity has been applied to bar claims under other statutes;[78] and (3) the TSA's purposes would not be so clearly impeded if attorneys "are immunized while they work within the scope of their representation of clients" that courts could be "*sure* that the Texas Legislature intended to abrogate attorney immunity in the context of TSA claims."[79] Each of these rationales supports application of the attorney-immunity defense to civil claims under the state wiretap statute. Because nothing in the Texas wiretap statute demonstrates

---

[76] 921 F.3d 501, 507-08 (5th Cir. 2019) (holding that the Texas Securities Act did not abrogate the attorney-immunity defense because the Act was not explicit in doing so and because giving effect to the defense would not impede the statute's purpose).

[77] *Id.* at 508.

[78] *Id.*

[79] *Id.*

22

clear legislative intent to preclude attorney immunity,[80] the common-law defense applies, and Taylor is immune from civil liability under that statute.

That does not mean that all conduct criminalized by the wiretap statute is immunized from civil liability or free of consequences. As we explained in *Bethel*, while criminal conduct is not categorically excepted from the attorney-immunity defense, neither is it categorically immunized by that defense.[81] Criminal conduct may fall outside the scope of attorney immunity,[82] and even when it does not, "nothing in our attorney-immunity jurisprudence affects an attorney's potential criminal liability if the conduct constitutes a criminal offense."[83] After all, "attorney immunity is not boundless."[84]

In that vein, we note that Robbins has not pleaded facts implicating Taylor in the alleged interception, either through action or advice. Our holding today does not foreclose the possibility that such

---

[80] *See Forest Oil*, 518 S.W.3d at 428; *see also Energy Serv.*, 236 S.W.3d at 194.

[81] *Bethel*, 595 S.W.3d at 658 (citations omitted).

[82] *Id.*

[83] *Id.*

[84] *Id.* at 657. As we have explained, attorney immunity applies only to lawyerly work that lawyers undertake to discharge their professional duties in connection with representation of a client. Our precedent identifies "several nonexhaustive examples of [wrongful] conduct that may fall outside the reach of the attorney-immunity defense," for failure to meet one or more of these requirements, including (1) "participat[ing] in a fraudulent business scheme with a client"; (2) "knowingly helping a client with a fraudulent transfer" so that client can "avoid paying a judgment"; (3) "theft of goods or services on a client's behalf"; and (4) "assaulting opposing counsel during trial." *Youngkin*, 546 S.W.3d at 682-83.

23

conduct might fall outside the scope of attorney immunity. But as those facts are not before us, we need not and do not express any opinion on the matter. In this case, all of Taylor's alleged conduct is covered by the attorney-immunity defense because it was within the scope of her representation of Broome and within her attorney function. She is therefore immune from liability under the Texas wiretap statute.

This conclusion does not, however, compel the same outcome with respect to the federal wiretap statute, which must be construed according to its own terms and in light of how federal courts would resolve the immunity question.

## D. Federal Wiretap Statute

Taylor argues that Texas's common-law attorney-immunity defense applies to claims under the federal wiretap statute because "Congress legislates against a background of common-law adjudicatory principles,"[85] and courts should assume that Congress enacted the federal wiretap statute with the expectation that common-law defenses will operate unless a statutory purpose to the contrary is evident.[86] We conclude that attorney immunity, as recognized and defined under Texas law, is not a defense under the federal wiretap statute because, quite simply, a state's common-law defense does not apply to federal

---

[85] *Blevins v. Hudson & Keyse, Inc.*, 395 F. Supp. 2d 655, 659 (S.D. Ohio 2004).

[86] *E.g.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well-established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" (citations omitted) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952))).

statutes.[87]  Further considerations that support our conclusion include (1) the federal statute's plain language, (2) federal authority declining to recognize extra-statutory defenses and immunities, and (3) Taylor's failure to identify a federal common-law defense that aligns with Texas's attorney-immunity defense that federal courts are likely to apply notwithstanding the statute's plain language.

When interpreting a federal statute, including whether it has abrogated certain affirmative defenses, we endeavor to "anticipate how the U.S. Supreme Court would decide the issue," and "[t]his analysis often draws on the precedents of other federal courts . . . to determine the appropriate answer."[88]  In considering the existence or parameters of a common-law defense that may apply to a federal statute, we also "look to the common law, not of Texas or any particular jurisdiction, but in general."[89]

Federal authority on the specific question of whether some version of attorney immunity applies to the federal wiretap statute is thin.  Although federal courts have held that government attorneys are absolutely immune from suit under 42 U.S.C. § 1983,[90] we have not

---

[87] *Cf. Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 895 (Tex. 2016) (holding that a defense derived from general common law, not Texas common law, applied to the Federal Employers' Liability Act).

[88] *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 189 (Tex. 2009); *see also In re Facebook, Inc.*, 625 S.W.3d 80, 87 (Tex. 2021) ("When interpreting a federal statute, this Court generally follows the decisions of the U.S. Supreme Court.").

[89] *Nami*, 498 S.W.3d at 895.

[90] *Imbler v. Pachtman*, 424 U.S. 409, 423-24 (1976); *see Barrett v. United States*, 798 F.2d 565, 571-73 (2d Cir. 1986) (holding that absolute immunity

25

found another statutory civil action to which a federal court has applied any form of common-law attorney immunity.

Moreover, when federal courts use the term "attorney immunity," they are not necessarily talking about Texas's particular brand of attorney immunity. Courts have assigned the "attorney immunity" appellation to defenses that substantively differ from one another.[91] In its most common usage, the immunity more or less equates to what is known in Texas as the judicial-proceedings privilege, which protects "[c]ommunications in the due course of a judicial proceeding" from "serv[ing] as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made."[92] The privilege's parameters are both broader and narrower than the attorney-immunity defense because the privilege covers "any statement made by the judge, jurors, counsel, parties[,] or witnesses" and "attaches to all aspects of the proceedings,"[93] but it is also limited to "liability for spoken or written words" (as opposed to a broad category of "actions" or "conduct") and is

---

also extends to state litigators in civil cases even if they are defending, rather than prosecuting, a case).

[91] *E.g.*, *Nix v. O'Malley*, 160 F.3d 343, 352-53 (6th Cir. 1998) (using the term "attorney immunity" to refer to what Texas courts call the judicial-proceedings privilege—a substantively different defense).

[92] *Landry's*, 631 S.W.3d at 46 (quoting *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982)); *see also* RESTATEMENT (SECOND) OF TORTS § 586 (AM. L. INST. 1977) ("An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.").

[93] *James*, 637 S.W.2d at 916-17.

inapplicable outside the judicial proceeding.[94]  Nearly all states recognize this variety of "absolute immunity for lawyers . . . with 'very little variation' from state to state."[95]  It is just known by other names in other states.[96]  In the federal cases Robbins cites as rejecting attorney immunity under the federal wiretap statute, the litigants had asked the court to adopt other states' versions of the judicial-proceedings privilege, referred to in those cases by variations on the phrase "attorney immunity."[97]  But because, under Texas law, the judicial-proceedings

---

[94] *Landry's*, 631 S.W.3d at 51.

[95] T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*, 31 PEPP. L. REV. 915, 917-18 (2004) (quoting Paul T. Hayden, *Reconsidering the Litigator's Absolute Privilege to Defame*, 54 OHIO ST. L.J. 985, 991-92 n.37 (1993)); *see Simms v. Seaman*, 69 A.3d 880, 886-87 (Conn. 2013) ("The principle that defamatory statements by attorneys during judicial proceedings are absolutely privileged when they are pertinent and material to the controversy is now well established in American jurisprudence."); RESTATEMENT (SECOND) OF TORTS § 586 (AM. L. INST. 1977).

[96] *See, e.g.*, *Simms*, 69 A.3d at 881 & n.1 ("litigation privilege"); *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 380 & 383 (Fla. 2007) ("litigation privilege"); *Kirschstein v. Haynes*, 788 P.2d 941, 948-54 (Okla. 1990), *superseded on other grounds by rule*, OKLA. SUP. CT. R. 1.26 ("absolute privilege"); *Surace v. Wuliger*, 495 N.E.2d 939, 942-43 (Ohio 1986) ("absolute privilege in judicial proceedings").

[97] *E.g.*, *Nix*, 160 F.3d at 352-53; *Babb*, 616 F. Supp. 2d at 1207-08; *see also Lewton v. Divingnzzo*, 772 F. Supp. 2d 1046, 1057 (D. Neb. 2011) (citing *Babb*, 616 F. Supp. 2d at 1207, and *Nix*, 160 F.3d at 352-53) ("[T]he court was unable to find any binding authority holding that an attorney who uses a communication intercepted in violation of the federal Wiretap Act is entitled to blanket immunity from Title III liability.  The court did find persuasive authority to the contrary.").

privilege is distinct from attorney immunity, those cases are not strictly applicable here.[98]

Even so, these cases, along with others, provide a strong basis for concluding that federal courts would be unlikely to apply Texas's attorney-immunity defense to the federal wiretap statute. Although we have found nothing on point, federal courts are nearly uniform in declining to adopt extra-statutory exceptions and refusing to apply state common-law defenses, such as the judicial-proceedings privilege and interspousal immunity.[99] Admittedly, there are few cases on the topic, but the reasons the courts have offered are straightforward.

---

[98] "The 'judicial-proceedings privilege' and 'attorney immunity' are 'independent [defenses] serving independent purposes.'" *Landry's*, 631 S.W.3d at 46 (alteration in original) (quoting *Cantey Hanger*, 467 S.W.3d at 485 n.12); *see id.* at 46-47 (detailing the differences between the two defenses).

[99] *Glazner v. Glazner*, 347 F.3d 1212, 1214-16 (11th Cir. 2003); *Kempf v. Kempf*, 868 F.2d 970, 972-73 (8th Cir. 1989); *Pritchard v. Pritchard*, 732 F.2d 372, 373-74 (4th Cir. 1984); *Lewton*, 772 F. Supp. 2d at 1057; *Babb*, 616 F. Supp. 2d at 1207-08; *Gill v. Willer*, 482 F. Supp. 776, 778 (W.D.N.Y. 1980); *Remington v. Remington*, 393 F. Supp. 898, 901-02 (E.D. Pa. 1975); *accord Ex parte O'Daniel*, 515 So. 2d 1250, 1253 (Ala. 1987); *see also United States v. Jones*, 542 F.2d 661, 667-73 (6th Cir. 1976); *Pyankovska v. Abid*, No. 2:16–CV–2942 JCM (PAL), 2017 WL 5505037, at *4 (D. Nev. Nov. 16, 2017) (applying *Babb*, 616 F. Supp. 2d at 1207); *compare Nix*, 160 F.3d at 350-53 (stating no implied statutory immunity "has a breadth equal to that of the common-law defamation privilege" and declining to adopt such immunity because (1) "th[e] proposed immunity contravenes the [statute's] plain language," which requires exceptions to be explicit and (2) the disclosures that occurred "exceed[ed] the boundaries of any attorney immunity because [they] were tangential to [the client's] defense," while at the same time (a) acknowledging that the circuit court had previously recognized "very narrow[]" "unwritten exceptions" and (b) adopting a narrow "defense exception" that offers defendants a limited privilege to use and disclose communications in defense of a wiretapping lawsuit).

First, the statute applies to "any person" "*[e]xcept as otherwise specifically provided*" in the statute.[100] This exclusivity language makes the terms of the federal statute materially different from the Texas statute. Based on this "plain and explicit" and "clear and unambiguous" language, federal courts have rejected exceptions and immunities that are not specifically enumerated in the statute.[101] Further, as federal

[100] 18 U.S.C. § 2511(1) (emphasis added).

[101] *Kratz v. Kratz*, 477 F. Supp. 463, 467 (E.D. Pa. 1979) ("The clear and unambiguous meaning of [section] 2511(1)(a) is to prohibit the interception of All wire communications by Any person *except as Specifically provided by Congress*." (emphasis added)); *see Heggy v. Heggy*, 944 F.2d 1537, 1540 (10th Cir. 1991) (concluding the federal wiretap statute does not exempt interspousal interception, use, or disclosure based on the statute's express language requiring an exception to be "specifically" articulated in the statute); *Nix*, 160 F.3d at 350-53 (declining to adopt the defamation privilege, in part, because "this proposed immunity contravenes [the statute's] plain language"); *Jones*, 542 F.2d at 666-67 (refusing to apply an interspousal-immunity privilege as a defense to prosecution based on the "straightforward and comprehensive" language of the statute, which "quite clearly expresses a blanket prohibition on all electronic surveillance except under circumstances specifically enumerated in the statute"); *Heyman v. Heyman*, 548 F. Supp. 1041, 1045-47 (N.D. Ill. 1982) (refusing to recognize an interspousal-immunity exception and declaring the statute's language "clear" and "unambiguous" in prohibiting any exceptions "except as specifically provided in the statute").

At least one federal court has also refused to apply a different state common-law defense—interspousal tort immunity—to the federal wiretap statute because Congress did not include the defense in far-reaching amendments. *E.g.*, *Heggy*, 944 F.2d at 1541. "[H]ad it been the intent of Congress to keep interspousal wiretapping beyond the reach of Title III, Congress could have expressly excluded [it] when it overhauled Title III in the Electronic Communications Privacy Act of 1986[.]" *Id.* But even though those "amendments touched nearly every section of Title III, Congress did not codify the judicially created exception for interspousal wiretapping[.]" *Id.* The choice not to codify the interspousal-immunity defense in an otherwise wide-ranging statutory overhaul has been interpreted as reflective of a congressional intent to deny the defense. *See id.*

courts have noted, the United States Supreme Court has generally stated that "the purpose of the Act is to effectively prohibit 'all interceptions of oral and wire communications, except those specifically provided for[.]'"[102]

Second, courts have explained that state law cannot modify federal law. As the Tenth Circuit succinctly put it: "The short answer to the [state common-law] immunity defense is that [the federal wiretap statute] creates a federal cause of action that cannot be barred by any state law or policy."[103] This view generally accords with our analysis in *Union Pacific Railroad Co. v. Nami*, which looked to general common-law principles, rather than the common law of Texas or any particular jurisdiction, in determining that the common-law *ferae naturae* doctrine applies to claims under the Federal Employers' Liability Act.[104]

While there is a dearth of federal cases on the precise issue presented, we think it unlikely that a federal court would apply Texas's common-law attorney-immunity defense to the federal wiretap statute

---

[102] *See Heyman*, 548 F. Supp. at 1045 (quoting *United States v. Giordano*, 416 U.S. 505, 514 (1974)).

[103] *Heggy*, 944 F.2d at 1541 n.8 (discussing the interspousal-immunity defense); *see Jones*, 542 F.2d at 672 (holding that the federal wiretap statute contains no express or implied exception for interspousal wiretaps and noting "[t]here is also substantial doubt whether a doctrine of state tort law should have any influence in defining a cause of action expressly created by federal statute, particularly when Congress could have included a similar provision in the statute and failed to do so"); *Kratz*, 477 F. Supp. at 475 ("[T]he cause of action in this case is provided by federal law and cannot be subverted by any state law or policy.").

[104] 498 S.W.3d at 895-99.

if presented with the question today. Based on the statute's plain language, which requires exceptions to be explicit, we also find it unlikely that a federal court would apply a federal common-law version of our attorney-immunity defense, but to the extent that is a reasonable possibility, Taylor has not substantiated the existence or contours of any such defense. Accordingly, we hold that Taylor may not invoke Texas's attorney-immunity defense as a bar to liability under the federal wiretap statute.

## III. Conclusion

Taylor is entitled to summary judgment on Robbins's state wiretapping claims because the kind of conduct alleged in support of those claims falls within the scope of the attorney-immunity defense. But Taylor is not entitled to summary judgment on Robbins's claims under the federal wiretap statute because we are not convinced that federal courts would apply Texas's common-law attorney-immunity defense to that statute. We thus affirm the court of appeals' judgment in part, reverse and render judgment in part, and remand the case to the trial court for further proceedings on the federal wiretap claims.

John P. Devine
Justice

**OPINION DELIVERED:** May 6, 2022

31